# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

*American Access Casualty Co. v. Reyes*, 2013 IL 115601

---

| | |
|---|---|
| Caption in Supreme Court: | AMERICAN ACCESS CASUALTY COMPANY, Appellant, v. ANA REYES *et al.*, Appellees. |
| Docket No. | 115601 |
| Filed | December 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Although, as a general matter, automobile liability insurance may exclude named drivers, it was a violation of public policy for an insurance contract to exclude a vehicle owner who was the only named insured, and it was error to find no coverage—remand. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Kane County, the Hon. Thomas E. Mueller, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Parrillo, Weiss & O'Halloran, of Chicago (Michael J. O'Halloran and Keely P. Hillison, of counsel), for appellant.

Yudkin & Brebner, PLLC, of Waukegan (Dennis A. Brebner and Keith G. Rhine, of counsel), for appellee.

Justices

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Freeman, Thomas, Karmeier, and Theis concurred in the judgment and opinion.

Justice Kilbride dissented, with opinion.

## OPINION

¶ 1     In this case, the appellate court concluded that an automobile liability insurance policy which excludes from coverage the only named insured and owner of the insured vehicle is against public policy, reversing the judgment of the circuit court which found that the policy provided no coverage. 2012 IL App (2d) 120296. For the reasons set forth below, we affirm the appellate court.

¶ 2                    BACKGROUND

¶ 3     In September 2007, plaintiff, American Access Casualty Company (American Access), issued an automobile liability insurance policy to defendant, Ana Reyes, which insured a 1999 Chrysler 300M. On the application, Reyes was identified as the titleholder of the vehicle. Under the "Operator Information" section of the policy, Reyes was identified as driver number one but where the driver's license number was to be included, it stated "TITLE HOLDER EXCLUDE." Jose M. Cazarez, Reye's "friend," was listed as driver number two and was identified as the "Pri[mary]" driver. Next to his name was an out of country/international driver's license number. On the "Declarations" sheet, Reyes was identified as the "named insured." Reyes and Cazarez were both again listed as "operators." However, the notation "EXCLUDED" appeared next to Reyes' name.

¶ 4     Reyes also executed an "ENDORSEMENT EXCLUDING SPECIFIED OPERATORS." This endorsement provided: "In consideration of the premium at which this policy is written, notwithstanding any other provision of the policy, it is agreed that no coverage is afforded undes [*sic*] policy and to any claim or suit which occurs as the result of the vehicle being operated by the following person(s)" after which Reyes was identified. The actual policy itself defined "named insured" as "the individual named in the Declarations and also includes his/her spouse, if a resident of the same household." The policy further contained a clause excluding liability coverage for any bodily injury or property damage caused by "any

automobile while in control of an excluded operator." Thus, under the policy, Reyes was the sole "named insured" but she was excluded from coverage.

¶ 5    On October 30, 2007, Reyes was driving her vehicle when she was involved in a traffic accident with two pedestrians, Rocio Jasso and her four-year-old son, Sergio. Rocio was seriously injured and Sergio died as a result of his injuries. Rocio and her husband, Brigido Jasso, filed a lawsuit against Reyes, alleging negligence and wrongful death. In response to this lawsuit, American Access filed the instant action, seeking a declaration that the policy it issued to Reyes provided no coverage for, and no duty to defend or indemnify, any claims and litigation arising from the accident. State Farm Insurance Company, which provided uninsured-motorist coverage to Rocio, answered the declaratory action and filed a counter complaint for declaratory judgment. State Farm alleged that American Access' attempt to exclude Reyes under the insurance policy violated public policy and therefore was unlawful.

¶ 6    The circuit court of Kane County granted summary judgment in favor of American Access, finding that the insurance policy provided no coverage for the accident. The appellate court reversed and remanded, holding that a blanket exclusion in an insurance policy, which precludes all liability coverage for the only named insured, violated public policy. 2012 IL App (2d) 120296. We granted American Access' petition for leave to appeal (Ill. S. Ct. R. (eff. Feb. 26, 2010)).


¶ 7                                             Analysis

¶ 8    Section 7-601(a) of the Illinois Safety and Family Financial Responsibility Law (625 ILCS 5/7-601(a) (West 2010)), a part of the Illinois Vehicle Code (Code), requires liability insurance coverage for all motor vehicles designed to be used on a public highway. *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 128 (2005); *State Farm Mutual Automobile Insurance Co. v. Smith*, 197 Ill. 2d 369, 373 (2001). Section 7-317(b)(2) of the Code mandates that a liability policy "[s]hall insure the person named therein and any other person using or responsible for the use of such motor vehicle or vehicles with the express or implied permission of the insured." 625 ILCS 5/7-317(b)(2) (West 2010); *Progressive*, 215 Ill. 2d at 128; *Smith*, 197 Ill. 2d at 373. This latter provision is commonly referred to as an "omnibus clause" and because it is required by statute, we have held that the clause must be read into every liability policy. *Progressive*, 215 Ill. 2d at 128; *State Farm Mutual Automobile Insurance Co. v. Universal Underwriters Group*, 182 Ill. 2d 240, 243-44 (1998). The principal purpose of this state's mandatory liability insurance requirement is to protect the public by securing payment of their damages. *Progressive*, 215 Ill. 2d at 129; *Smith*, 197 Ill. 2d at 376.

¶ 9    The issue in this case is whether an automobile liability policy can exclude the *only* named insured and owner of the vehicle without violating public policy. When a statute exists for the protection of the public, it cannot be overridden through private contractual terms. *Progressive*, 215 Ill. 2d at 129. One reason for this rule is that "the members of the public to be protected are not and, of course, could not be made parties to any such contract." *American Country Insurance Co. v. Wilcoxon*, 127 Ill. 2d 230, 241 (1989). Where liability coverage is mandated by statute, a contractual provision in an insurance policy which

-3-

conflicts with the statute will be deemed void. *Progressive*, 215 Ill. 2d at 129. When we assess whether a statutory provision prevails over a contractual provision, however, we must keep in mind that parties have freedom to contract as they desire. *Id.* We have reasoned:

> "The freedom of parties to make their own agreements, on the one hand, and their obligation to honor statutory requirements, on the other, may sometimes conflict. These values, however, are not antithetical. Both serve the interests of the public. Just as public policy demands adherence to statutory requirements, it is in the public's interest that persons not be unnecessarily restricted in their freedom to make their own contracts." *Id.*

Accordingly, we use our power to declare a contractual provision void as against public policy sparingly. *Id.* A contractual provision will not be invalidated on public policy grounds unless it is clearly contrary to what the constitution, the statutes, or the decisions of the courts have declared to be the public policy or unless it is manifestly injurious to the public welfare. *Id.* at 129-30. Such a determination depends upon the particular facts and circumstances of each case. *Id.* at 130.

¶ 10    State Farm contends that, under the plain language of the Code, coverage is required for Reyes. We agree. The primary objective of statutory construction is to ascertain and give effect to the legislature's intent. *Citizens Opposing Pollution v. ExxonMobil Coal U.S.A.*, 2012 IL 111286, ¶ 23. The best indicator of the legislature's intent is the language of the statute itself, given its plain and ordinary meaning. *Id.*

¶ 11    The plain and unambiguous language of section 7-317(b)(2) mandates that an automobile liability policy cover the "person named therein." In this case, Reyes is the "person named therein." In fact, Reyes is the only person named therein as the applicant, owner of the vehicle, and, according to the Declarations, the "named insured." Excluding the "person named therein," who is required to be covered by the Code, through a contractual provision, violates section 7-317(b)(2) and, therefore, public policy.

¶ 12    Despite the clear import of section 7-317(b)(2), American Access argues that requiring the "named insured" to be covered distorts the legislature's intent by substituting words not found in the statute. According to American Access, that section 7-317(b)(2) uses the phrase "person named therein" rather than "named insured" is significant. We disagree.

¶ 13    This court has previously concluded that the phrase "person named therein" is synonymous with "named insured." *Universal*, 182 Ill. 2d at 244 (concluding that section 7-601(a), together with section 7-317(b)(2), mandates that "a liability insurance policy issued to the owner of a vehicle must cover the named insured and any other person using the vehicle with the named insured's permission"); *Smith*, 197 Ill. 2d at 374 ("Section 7-317(b)(2) is clear. It mandates that a motor vehicle liability policy, or a liability insurance policy, cover the named insured and any other person using the vehicle with the named insured's permission."). Moreover, the legislature itself equates "person named therein" with "insured" in section 7-317(b)(2) since it utilizes both terms. The legislature uses "person named therein" in the first clause and then "insured" in the second clause when addressing permissive users. Clearly, the legislature intended both terms to have the same meaning. As such, American Access' argument to the contrary is unpersuasive. Here, according to

American Access' own Declarations page, Reyes is the named insured. And, in the policy itself, the "named insured" is identified as the person named in the Declarations, which is Reyes, and his/her spouse. Accordingly, under the above authority and pursuant to the plain and clear language of section 7-317(b)(2), Reyes cannot be excluded from coverage under the policy.

¶ 14    Nonetheless, American Access contends that requiring the named insured to be covered conflicts with Illinois law because this court and various appellate court decisions have upheld named driver exclusions. See, *e.g.*, *Dungey v. Haines & Britton, Ltd.*, 155 Ill. 2d 329 (1993); *Heritage Insurance Co. of America v. Phelan*, 59 Ill. 2d 389 (1974); *Rockford Mutual Insurance Co. v. Economy Fire & Casualty Co.*, 217 Ill. App. 3d 181 (1991); *St. Paul Fire & Marine Insurance Co. v. Smith*, 337 Ill. App. 3d 1054 (2003); *American Service Insurance Co. v. Arive*, 2012 IL App (1st) 111885. American Access points out that Reyes executed an endorsement which excluded her from coverage as a named driver. According to American Access, this was proper under Illinois law. Again, we disagree.

¶ 15    There is no question that, as a general matter, named driver exclusions are permitted in Illinois. *Dungey*, 155 Ill. 2d at 336; *Phelan*, 59 Ill. 2d at 396; *Arive*, 2012 IL App (1st) 111885, ¶ 17; *Smith*, 337 Ill. App. 3d at 1060; *Rockford*, 217 Ill. App. 3d at 187. However, as State Farm points out, none of the authorities relied upon by American Access address the question at issue here—whether the *sole* named insured and owner can be excluded from coverage. In *Dungey*, we upheld a named driver exclusion for the husband of the named insured wife. In *Phelan*, the issue was whether the excluded driver, who was the insured's teenage son, was an "operator" under the language of the exclusion provision since at the time of the accident, he was outside of the insured vehicle. In *Rockford*, the named insureds' son was excluded, and the issue was whether that named driver exclusion violated public policy to the extent it voided uninsured-motorist coverage. In *Smith*, once again, the named insureds' son was excluded, and the issue was whether this exclusion violated public policy. Lastly, in *Arive*, the issue was whether the fact that the excluded driver was not listed on the insurance card rendered the named driver exclusion unenforceable. Again, none of these cases addressed the question of whether the *sole* named insured can be excluded and none of these cases held that a named driver exclusion can override the plain language of section 7-317(b)(2).

¶ 16    American Access further argues that Reyes may be excluded from coverage under section 7-602 of the Code. Section 7-602 requires every operator to carry within his or her vehicle evidence of insurance, which may include an insurance card provided by the insurer. 625 ILCS 5/7-602(a) (West 2010). The section provides in pertinent part:

> "If the insurance policy represented by the insurance card does not cover any driver operating the motor vehicle with the owner's permission, or the owner when operating a motor vehicle other than the vehicle for which the policy is issued, the insurance card shall contain a warning of such limitations in the coverage provided by the policy." 625 ILCS 5/7-602 (West 2010).

American Access argues that section 7-602 allows exclusion of "any" driver. We again disagree.

¶ 17     American Access ignores the full language of section 7-602. With respect to "any driver," the full clause is "does not cover any driver operating the motor vehicle *with the owner's permission*." (Emphasis added.) The legislature was referring to permissive drivers in the first clause given the "with the owner's permission" language and the fact that certain permissive drivers may be excluded from coverage. Section 7-602 then provides, "does not cover *** the owner when operating a motor vehicle other than the vehicle *for which the policy is issued*." (Emphasis added.) This last clause indicates the legislature was referring to the policy holder or insured given the "for which the policy is issued" language. This clause allows exclusion of an owner or policy holder or insured for *other* vehicles, not the vehicle that is insured. This clause does not authorize a named driver exclusion for the sole insured and owner of the vehicle. Thus, American Access' argument that *any* driver may be excluded is without merit.

¶ 18     We further reject American Access' claim that, because named driver exclusions were a policy defense at common law, they are available under section 7-601(a). Section 7-601(a) provides: "Nothing herein shall deprive an insurer of any policy defense available at common law." 625 ILCS 5/7-601(a) (West 2010). In *Smith*, State Farm made a similar argument in connection with the automobile business exclusion. We disagreed. Assuming, *arguendo*, that section 7-601(a) applied to that case at all, we interpreted the sentence "[n]othing herein shall deprive an insurer of any policy defense available at common law" to mean that nothing in the Code prohibits an insurance company from asserting traditional common law defenses. *Smith*, 197 Ill. 2d at 377. We construed the phrase "policy defense available at common law" to refer to customary common law contract defenses, such as fraud or misrepresentation, illegality or justiciability. We reasoned that exclusions written into a liability policy by an insurance company are not "policy defenses available at common law" because they are contractual provisions. Accordingly, we held that such exclusions do not fall within the meaning of section 7-601(a). *Id.* at 377-78. We see no reason to depart from that holding.

¶ 19     Lastly, American Access asserts a public policy argument, maintaining that the type of exclusions at issue here makes it possible for individuals with high risk factors to be covered by insurance at a reasonable rate, rather than operate a vehicle with no insurance at all. We reject this argument. Public policy is expressed in the plain language of section 7-317(b)(2), which we must follow. Further, it is apparent why the legislature has deemed that the named insured must be covered under an automobile liability policy. As one court has stated:

    "Our interest in protecting the driving public far outweighs an insured's desire to exclude himself from coverage in order to avail himself of a lower premium. To allow an insured to exclude himself from coverage and drive as an uninsured motorist, runs afoul of the overall purpose and intent of Louisiana's compulsory insurance law. In the instant case, [the named insured] purchased liability insurance coverage, purported to exclude himself as a driver of his own vehicle, and then caused an accident resulting in injury. This court will not uphold such actions at the expense of the injured person whom our statutory insurance law is designed to protect. Clearly, the legislature did not intend that citizens such as these plaintiffs would suffer injury, and a tortfeasor would escape liability because he waived the mandatory liability coverage which is required by statute." *Williams v. US Agencies*

*Casualty Insurance Co.*, 779 So. 2d 729, 732 (La. 2001) (superseded by statute). Although *Williams* is a Louisiana case, we find its reasoning equally applicable here.

¶ 20    For the foregoing reasons, we hold that an automobile liability insurance policy cannot exclude the sole named insured since such an exclusion conflicts with the plain language of section 7-317(b)(2) and, therefore, violates public policy. Accordingly, we affirm the judgment of the appellate court, which reversed the judgment of the circuit court and remanded the cause to the circuit court for further proceedings.

¶ 21    Affirmed.

¶ 22    JUSTICE KILBRIDE, dissenting:

¶ 23    I respectfully dissent from the majority opinion because I believe that permitting a sole named insured to be listed as an excluded driver in motor vehicle liability policies is consistent with both the legislative intent expressed in article III of the Illinois Safety and Family Financial Responsibility Law and our case law. This court is, and properly should be, reluctant to invalidate a contractual provision because it is contrary to public policy. We may only take that step when the provision is "clearly contrary to" established public policy or "manifestly injurious" to the welfare of the public. *Supra* ¶ 9. Here, the policy provision does not rise to that level.

¶ 24    To construe the legislature's intent, we must look to the plain language of the statute whenever possible. *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 48. In addition, we may consider the reason and necessity for the law, the evils sought to be remedied, and the statute's underlying purpose. *Carter v. SSC Odin Operating Co.*, 2012 IL 113204, ¶ 37. This court's task is to effectuate the legislative intent expressed in plain and unambiguous language adopted, without adding to or subtracting from those terms. *Metropolitan Life Insurance Co. v. Hamer*, 2013 IL 114234, ¶ 18.

¶ 25    Here, one of the key provisions is section 7-317. It states:

"(a) **Certification**.—A 'motor vehicle liability policy', ***, means an 'owner's policy' or an 'operator's policy' of liability insurance, certified *** as proof of financial responsibility for the future, and issued, ***, *to or for the benefit of the person named therein as insured*.

(b) **Owner's Policy**.—Such owner's policy of liability insurance:
***

2. Shall insure the person named therein and *any other person using or responsible for the use* of such motor vehicle or vehicles *with the express or implied permission of the insured*;

3. Shall insure *every named insured and any other person using or responsible for the use of any motor vehicle owned by the named insured and used by such other person with the express or implied permission of the named insured* on account of the maintenance, use or operation of any motor vehicle owned by the named insured, *** against loss from liability imposed by law arising from such maintenance, use

-7-

or operation ***." (Emphases added.) 625 ILCS 5/7-317(a), (b) (West 2010).

While I agree with the majority that subsection (b) requires the liability policy to provide coverage for "the person named" and "every named insured" (*supra* ¶¶ 11-13), we part company there because I conclude that the liability policy at issue here satisfies section 7-317 when carefully read as a whole.

¶ 26    Subsection (b) also mandates coverage for all permissive users of the vehicle. 625 ILCS 5/7-317(b)(2), (3) (West 2010). A closer look at the specific qualifying language used in subsection (b)(3) reveals that coverage must extend to "every named insured and any other person using or *responsible for the use of* any motor vehicle owned by the named insured and used by such other person with the express or implied permission of the named insured." (Emphasis added.) 625 ILCS 5/7-317(b)(3) (West 2010). The person who would most likely be "responsible for the use of" the named insured's car when it is "used by such other person with the express or implied permission of the named insured" would logically be the named insured. Therefore, the plain statutory language compels coverage for the named insured against any liability arising from her decision to allow another driver to use the vehicle. 625 ILCS 5/7-317(b)(3) (West 2010). That coverage, in turn, satisfies subsection (b)(2) as well because it does not specify the type of coverage mandated for "the person named therein." The named insured's status as an excluded driver under the policy does not alter either of those statutory requirements. In other words, to comply with the critical portions of subsection (b), the policy may simply provide coverage for the named insured against any liability incurred by permitting *another* driver to use her vehicle regardless of whether or not the named insured is also listed as an excluded driver.

¶ 27    Similarly, to comply with section 7-317(a), the policy must be issued "to or for the benefit of the person named therein as insured." 625 ILCS 5/7-317(a) (West 2010). By a policy "issued to" the named insured that provides "the benefit of" coverage for any liability resulting from her decision to allow another driver to use her vehicle, subsection (a) is also satisfied. Accordingly, a sole named insured who is also an excluded driver is not completely bereft of coverage, and the liability policy is fully compliant with section 7-317.

¶ 28    As additional support for this conclusion, nothing in section 5-317 requires the liability policy to include multiple named insureds *or* to preclude a sole named insured from being an excluded driver. Thus, a plain language analysis fails to support the contrary conclusion that the legislature intended to bar sole named insureds from being excluded when personally operating insured vehicles.

¶ 29    My construction of the statute is confirmed when viewed in the light of the strict limitations placed on this court's ability to invalidate contractual provisions as against public policy. As the majority correctly notes, this power must be used "sparingly," requiring that the insurance policy provision be "clearly contrary to what the constitution, the statutes, or the decisions of the courts have declared to be the public policy or unless it is manifestly injurious to the public welfare." *Supra* ¶ 9. I dissent because I do not believe that high standard has been met in this case. I would hold that the named driver exclusion is enforceable and not contrary to public policy.

¶ 30    As further support for this conclusion, the majority has acknowledged that our case law

has never required more than one named insured to render an excluded driver provision enforceable. *Supra* ¶ 14. Moreover, statutory analysis of other, related, provisions in article III supports this conclusion as well.

¶ 31    Article III addresses proof of future financial responsibility, with section 7-301 defining its scope:

> "The provisions of this Article requiring the deposit of proof of financial responsibility for the future, ***, shall apply with respect to persons whose driver's license or driving privileges have been revoked ***, or who have failed to pay judgments amounting to $500 or more ***." 625 ILCS 5/7-301 (West 2010).

Next, section 7-304 explains the potential consequences of a license revocation:

> "[u]pon the revocation of a driver's license ***, the Secretary of State shall *suspend any and all of the registration certificates, license plates and registration stickers* issued for any motor vehicle *registered in the name of such person as owner except* that the Secretary *shall not suspend* such evidences of registration in the event such owner has *previously given or shall immediately give *** and thereafter maintain ***, proof of financial responsibility* in the manner hereinafter specified in this Article *with respect to each and every motor vehicle owned and registered by such person*." (Emphases added.) 625 ILCS 5/7-304 (West 2010).

Section 7-305 then continues:

> "The suspension of such certificates of registration, license plates and registration stickers of such person as provided for in Section 7-304 *shall remain in effect *** until permitted under this Article and not then *unless and until said person gives proof of his financial responsibility* in the future, as defined in this Code ***." (Emphases added.) 625 ILCS 5/7-305 (West 2010).

¶ 32    To establish proof of financial responsibility, the Code permits "[a] certificate of insurance as provided in Section 7-315 or Section 7-316" to be filed with the Secretary of State. 625 ILCS 5/7-314(1) (West 2010). Although section 7-316 is inapplicable here because it addresses a nonresident's proof of insurance, section 7-315 is highly relevant. It states:

> "(a) Proof of financial responsibility may be made by filing *** the written or electronic certificate of any insurance carrier duly ***, certifying that it has *issued to or for the benefit of the person furnishing such proof and named as the insured* in a motor vehicle liability policy, *a motor vehicle liability policy* or policies *** and that said policy or policies are then in full force and effect. ***
>
> ***
>
> (c) The Secretary of State shall not accept any certificate *** unless the same *shall cover all motor vehicles then registered in this State in the name of the person furnishing such proof as owner ***."* (Emphases added.) 625 ILCS 5/7-315(a), (c) (West 2010).

¶ 33    To summarize, when a driver's license is revoked, the registration certificates, license plates, and registration stickers for all vehicles owned by the revoked driver are suspended

until proof of financial responsibility is filed. That proof may consist of a certificate of motor vehicle liability insurance covering all affected vehicles that is "issued to or for the benefit of the person furnishing such proof and named as the insured." 625 ILCS 5/7-315(a) (West 2010).

¶ 34　Consistent with the requirement that all motor vehicles driven on the state's public highways be covered by a liability policy (625 ILCS 5/7-601(a) (West 2010)), the legislature created this procedure to encourage revoked drivers to register and license their vehicles even though they may not legally get behind the wheel. The insurance requirement would also protect the interests of the public. *Supra* ¶ 8.

¶ 35　Because the same provisions apply in the instant appeal and the revoked driver context, the majority's holding would also apply equally. Common sense and practical experience dictate that liability coverage for the operation of a vehicle by someone without a valid driver's license would be extremely expensive. Nonetheless, under the majority's view, revoked drivers would be required to obtain coverage on themselves as unlicensed operators or be unable to register and license their vehicles. I reject that result because the legislature created the financial responsibility laws, at least in part, to provide a way for revoked drivers to comply with the registration and licensure requirements. I do not believe the legislature would create a statutory scheme that implicitly condones the use of uninsured, unlicensed, and unregistered vehicles by establishing a procedure that effectively ensures liability coverage on only those vehicles owned by revoked drivers who could afford exorbitant premiums to cover themselves if they are illegally behind the wheel.

¶ 36　If, hypothetically, that were the intent of the legislature, however, it would create at least two highly undesirable consequences: (1) many revoked drivers would forgo mandatory coverage, choosing instead not to register and license their vehicles; and (2) their decision not to insure would leave injured members of the general public without any financial recourse from insurance, even if a validly licensed driver were at the wheel of the insured's car. Those results would be antithetical to the principal purpose of our mandatory liability insurance requirement, namely, "to protect the public by securing payment of their damages" (*supra* ¶ 8).

¶ 37　To remain consistent with the underlying legislative purpose determined by this court, the legislature must have intended revoked drivers, including those who are sole named insureds, to be able to exclude themselves as vehicle operators. That would rationally tie their ability to register and license their vehicles to a realistic opportunity to obtain affordable liability coverage. The legislature would then be encouraging, not discouraging, owners' voluntary compliance with the financial responsibility laws and their retention of liability policies, thus providing maximum protection to the general public. For this reason as well, I cannot concur in the majority's holding that sole named insureds may not be listed as excluded drivers.

¶ 38　Finally, American Access points out an even more disturbing consequence of the majority's construction, affecting elderly drivers and those suffering from disabilities that are inconsistent with safe driving, such as blindness. While those individuals may wisely choose to surrender, or never even obtain, driver's licenses and rely solely on family members,

neighbors, or other caregivers for transportation, they may still own a car for a variety of reasons, both personal and practical. Under the majority's view, those well intentioned vehicle owners would likewise be trapped in the catch-22 created by the majority's holding.

¶ 39       To comply with the requirement that all motor vehicles used on public highways be covered by liability insurance (625 ILCS 5/7-601(a) (West 2010)), the elderly or disabled owner would be mandated to acquire liability coverage. That coverage could be either an owner's policy or an operator's policy (625 ILCS 5/7-317(a) (West 2010)). Here, it was an owner's policy. Not only is an owner's policy by far the most well known and common option, but the alternative of an operator's policy presents its own problems, as discussed later.

¶ 40       Under the majority's view, the disabled or elderly vehicle owner who happens to be a sole named insured would have to be covered as a potential driver of the vehicle in an owner's policy, despite admittedly possessing neither the ability nor the intent to drive. Practically speaking, the premium due for an elderly, blind "driver" would be prohibitively high for many, if not virtually all, those individuals. Moreover, the greatest burden would fall on those people living on a low fixed income. Consequently, the elderly and disabled would be presented with a strong incentive to forgo any liability insurance, creating a serious risk that injured members of the public would be unable to secure compensation. Once again, the majority's construction would create a result that is in direct conflict with the express statutory purpose of protecting the injured public by providing a reliable source of compensation.

¶ 41       The availability of operator's policies does not offer the disabled or elderly vehicle owner a more realistic alternative. If, as experience dictates is often the case, the owner relies on several drivers, each one would be required to carry a separate operator's insurance policy, again greatly multiplying the overall cost and inconvenience. In addition, the public would still be less likely to receive full protection because not every driver would be aware of the need for, be able to afford, and go to the trouble to obtain the additional coverage.

¶ 42       The problem becomes even more compelling if the insured's vehicle must be specially equipped to accommodate a wheelchair or other vital equipment, making it highly unlikely that a family member or other caretaker could easily provide alternative transportation in another car. It is difficult, at best, to envision that the legislature intended to give disabled and elderly vehicle owners a strong incentive *not* to insure their vehicles, particularly in the absence of any statutory language limiting the use of excluded driver provisions to vehicles with multiple named insureds.

¶ 43       For these reasons, I do not believe the majority's construction of the statutory provisions at issue comports with the intent of the legislature. Furthermore, the facts and circumstances do not establish that the excluded driver provision in the parties' insurance contract is "clearly contrary to what the constitution, the statutes, or the decisions of the court have declared to be the public policy or *** is manifestly injurious to the public welfare." *Supra* ¶ 9. Indeed, I believe the opposite conclusion is apparent. Because the majority reaches the opposite conclusion, however, I urge the legislature to examine the statute in light of the plight of many elderly and disabled vehicle owners and provide them with some much

needed statutory relief.

¶ 44      In my view, the far more reasonable and practical construction of the current statutory scheme would permit sole named insureds to exclude themselves from liability coverage as drivers, while enabling them to obtain coverage on their permissive drivers. The named insureds would also have coverage for themselves to the extent to cover any liability they may face for allowing other drivers access to their vehicles. This would allow virtually all car owners to register and license their vehicles by complying with the mandatory insurance provisions, while also protecting the interests of the general public. Accordingly, I must respectfully dissent from the majority opinion.