# Illinois Official Reports

## Appellate Court

---

### *Singapori v. Jagaria*, 2017 IL App (1st) 160937

---

| | |
|---|---|
| Appellate Court Caption | RICHARD SINGAPORI and ESHAAN HOSPITALITY, INC., an Illinois Corporation, Plaintiffs-Appellants and Cross-Appellees, v. JIGNESH JAGARIA and NOVAK HOSPITALITY, INC., an Illinois Corporation, Defendants-Appellees and Cross-Appellants. |
| District & No. | First District, Sixth Division<br>Docket No. 1-16-0937 |
| Filed | July 28, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-L-5220; the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Kenneth J. Ashman and Neal D. Kitterlin, of Ashman Law Offices, of Chicago, for appellants.<br><br>Sullivan, Hincks & Conway, of Oak Brook (John J. Conway and Andrew S. Johnson, of counsel), for appellees. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Presiding Justice Hoffman and Justice Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1      The plaintiffs, Richard Singapori and Eshaan Hospitality, Inc. (Eshaan), filed the instant action against the defendants, Jignesh Jagaria and Novak Hospitality, Inc. (Novak), alleging breach of a confidentiality provision contained in an "Agreement" between the parties.[1] The circuit court granted the defendants' motion to dismiss, finding that the confidentiality provision at issue was void and unenforceable as a matter of public policy because its sole purpose was to conceal the parties' misrepresentations to third-party financial institutions. On appeal, the plaintiffs argue that the court erred in determining that the confidentiality provision is contrary to public policy because allegations of the amended complaint do not establish that the parties violated federal bank fraud laws (see 18 U.S.C. §§ 1344, 1014 (2012)). The defendants cross-appeal, contending that the court erred in denying their petition for attorney fees. For the reasons that follow, we affirm.

¶ 2      The following facts are derived from the various pleadings, which we accept as true in the context of a motion to dismiss. See *Wackrow v. Niemi*, 231 Ill. 2d 418, 420 (2008).

¶ 3      Singapori and Jagaria, uncle and nephew, were the sole shareholders of two corporations, Eshaan and Novak. Singapori held a 51% ownership interest in both corporations, while Jagaria held the remaining 49% interest. In June 2011, Singapori and Jagaria became interested in purchasing a Red Roof Inn hotel in Deerfield, Illinois. To finance the purchase, Singapori and Jagaria, on Eshaan's behalf, applied for two loans in the amount of $1,317,500 and $946,000 from the International Bank of Chicago (IBC) and SomerCor 504 (SomerCor), respectively. Both loans were to be guaranteed by the Small Business Administration (SBA).[2] A partial copy of the loan application submitted to the IBC is attached as an exhibit to the amended complaint. The first page of that application contains a cautionary note, immediately above Jagaria's signature, stating: "Applicant(s) are aware that any knowing or willful false statements for the purposes of influencing the actions of Creditor can be a violation of federal law 18 U.S.C. sec. 1014 and may result in fine or imprisonment or both." The amended complaint alleges that Jagaria made several false statements in the loan application regarding his citizenship status, arrest history, and his experience in the hotel industry, notwithstanding the admonition requiring candor and truthfulness. The IBC and SomerCor both approved Eshaan's request for a loan.

¶ 4      At the closing, on August 8, 2011, Eshaan executed two notes, promising to repay the loans. IBC's note provided that any ownership change of 25% or more of the common stock of Eshaan would constitute a default, while the note with SomerCor stated that any changes in "ownership or business structure without [SomerCor]'s prior written consent" would trigger a default. Upon default, IBC and SomerCor would have the right to require immediate payment of all amounts owing under their respective notes. In addition to the security agreements, Singapori was required to sign a personal guaranty of the loans, as well as a "Borrower and Operating Company Certification," upon which he certified that he "will not, without the prior

---

[1]We note that certain documents in the record, including portions of the amended complaint, spell Jagaria's last name as "Jigaria."

[2]The SBA is a federal government agency that assists small businesses in obtaining financing by guarantying loans made to them by private banks. *United States v. McCarrick*, 294 F.3d 1286, 1288 n.2 (11th Cir. 2002).

written consent \*\*\* change the ownership structure of or interests in the Borrower and Operating Company during the term of the Note \*\*\*."

¶ 5    Less than a year later, Singapori and Jagaria became interested in purchasing another Red Roof Inn hotel, this time in Lansing, Illinois (hereinafter referred to as the Lansing hotel). In April 2012, Singapori and Jagaria, on behalf of Novak, applied for two loans in the amount of $1.25 million and $758,000 from the IBC and SomerCor, respectively. Again, both loans were to be guaranteed by the SBA. The amended complaint alleges that Jagaria made several false statements in the loan application to SomerCor regarding his citizenship status, arrest history, and his experience in the hotel industry. The loan application also states that Singapori and Jagaria each have a 50% ownership interest in Novak.

¶ 6    After the loan applications were submitted to the IBC and SomerCor, a dispute arose between Singapori and Jagaria, which delayed their ability to obtain financing. On September 19, 2012, Singapori and Jagaria entered into an "Agreement" to "resolve their differences and move forward with the purchase of [the] Lansing [hotel] and adjust their respective interests in [Eshaan and Novak]." The amended complaint alleges that, pursuant to the "Agreement," Singapori transferred all of his shares in Novak to Jagaria, and Jagaria transferred all of his shares in Eshaan to Singapori. As a consequence, Singapori became the sole owner of Eshaan and Jagaria became the sole owner of Novak.

¶ 7    Although Singapori and Jagaria sought to terminate their business relationship and shared ownership interest in Eshaan and Novak, section 7 of the "Agreement" required the parties to work together to ensure the successful operation of their hotels. That section provides as follows:

"7. The parties agree to fully cooperate with each other and to take all actions and perform all acts as shall be necessary for the successful operation of the respective hotels. Said cooperation shall include the signing of corporate, financial, franchise and other documents as shall be needed from time to time and to execute any and all deeds, affidavits, bills of sale and all other closing documents \*\*\*."

¶ 8    Moreover, according to the amended complaint, the parties recognized that "severe negative financial consequences could occur \*\*\* if the terms of the Agreement were not kept strictly confidential." For example, disclosure of the ownership change in Eshaan could trigger a default under Eshaan's loans with the IBC and SomerCor, while disclosure of the ownership change in Novak could result in the denial of its pending loan applications. As a consequence, the parties' "Agreement" contained "a strict confidentiality provision, which included a liquidated damages clause to ensure confidentiality and guard against the uncertainty of \*\*\* whether disclosure would or would not result in defaults under the various [loan] agreements and guarantees." Section 8 of the "Agreement" states as follows:

"8. The terms of this Agreement shall be kept confidential between the parties and shall not be disclosed for any reason to any person or entity including any bank, financial institution, franchisor, employee, agent or attorney without the prior written consent of the other party. Any disclosure without written approval of the other party shall require the payment of the sum of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) to the non-disclosing party for each incident or event of prohibited disclosure without any necessity of proof of actual damages by the other. All claims of improper disclosure must be proven by a claiming party to a court of competent jurisdiction as a prerequisite to any liability of a party under this paragraph."

¶ 9    In October 2012, following execution of the "Agreement," the IBC and SomerCor agreed to loan Novak $1.25 million and $758,000, respectively. Although Singapori no longer held an ownership interest in Novak, he signed various closing documents purporting to be the "President" of the company, including a note, a loan agreement, and a "Borrower's Certification to Lender," certifying that Novak has provided accurate financial information and will not change its ownership structure without the prior written consent of the IBC, SomerCor, or the SBA. He also signed a personal guaranty of the loans. The loan and guaranty documents enumerate various events of default, including changes in ownership or business structure without prior written consent, the failure to disclose material facts, and making materially false or misleading representation to the IBC, SomerCor, or the SBA.

¶ 10    At some point after Singapori and Jagaria entered into the "Agreement," Jagaria's family became involved in a dispute that proceeded to litigation in India. During the course of that litigation, Jagaria submitted an affidavit to the Indian court, which disclosed the contents of the "Agreement" without Singapori's or Eshaan's written consent. In the affidavit, Jagaria stated, in pertinent part, as follows:

"32. With the assistance of attorneys, Richard Singapori and I drafted and signed an agreement that provided I surrender my 49% interest in Red Roof Inn of [Deerfield] and that Richard Singapori pay me $600,000. I used these [*sic*] to buy Red Roof Inn of Lansing, Illinois.

33. Since entering into the agreement referred to in paragraph 32, Richard Singapori and I were no longer in business together."

¶ 11    In December 2015, the plaintiffs filed a six-count amended complaint in the circuit court of Cook County, claiming that the defendants breached the confidentiality provision. The amended complaint alleges that Jagaria breached the confidentiality provision by disclosing the terms of the "Agreement" to the court in India (count I), an attorney involved in that litigation (count II), and his mother, Jayshree Jagaria (count III). Counts IV through VI of the amended complaint contain the same claims except they are brought against Novak. In their prayer for relief, the plaintiffs seek $100,000 in liquidated damages for each disclosure.

¶ 12    In January 2016, the defendants filed a combined motion to dismiss the plaintiffs' amended complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2014)). The defendants argued that the amended complaint should be dismissed pursuant to section 2-619(a)(9) of the Code because the liquidated damages clause is unenforceable as a matter of public policy, as it operates as a penalty. In the section 2-615 portion of the motion, the defendants asserted that the plaintiffs' amended complaint should be dismissed because it failed to allege actual damages.

¶ 13    In response, the plaintiffs maintained that the liquidated damages clause is not a penalty because the amount—$100,000 per disclosure—is reasonable and bears some relationship to the damages that might be sustained should the IBC, SomerCor, or the SBA learn about the ownership changes in Eshaan and Novak and determine that a default occurred. The plaintiffs further argued that the amended complaint adequately pled damages based upon the liquidated damages clause and they need not prove actual damages.

¶ 14    In March 2016, the circuit court dismissed the plaintiffs' amended complaint with prejudice on grounds not raised by either party. Specifically, the court noted that federal bank fraud laws prohibit individuals from obtaining credit from a financial institution "by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2) (2012); see

also 18 U.S.C. § 1014 (2012). The court found that "[t]he confidentiality provision in the parties' contract was drafted with one purpose in mind—to keep [the parties'] prior and continuing misrepresentations to the SBA lenders secret." The court concluded that "[t]he provision is patently against public policy and will not be enforced by this Court." This timely appeal followed.

¶ 15 At the outset, we note that the plaintiffs suggest that the circuit court dismissed their amended complaint pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2014)). In fact, the court never identified whether the dismissal order was entered pursuant to section 2-615 or 2-619 of the Code; rather, it simply stated it was granting the defendants' section 2-619.1 motion to dismiss. In any case, the circuit court dismissed the amended complaint on grounds that the confidentiality provision is unenforceable because it is against public policy. As the factual basis of this determination appears on the face of the pleadings, section 2-615 of the Code applies. See *K. Miller Construction Co. v. McGinnis*, 238 Ill. 2d 284, 292 (2010) (affirmative defense that contract is illegal may be raised in a section 2-615 motion where the defense is established by facts apparent on the face of the complaint).

¶ 16 Motions to dismiss under section 2-615 challenge the legal sufficiency of a complaint based on defects apparent on its face. *Id.* at 291. When reviewing a dismissal order under section 2-615, we accept as true all well-pleaded facts in the complaint and all reasonable inferences that may be drawn from those facts. *Id.* "The critical inquiry is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted." *Kanerva v. Weems*, 2014 IL 115811, ¶ 33. A cause of action should not be dismissed pursuant to section 2-615 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recover. *Id.* Our review of an order granting a section 2-615 motion to dismiss is *de novo*. *McGinnis*, 238 Ill. 2d at 291.

¶ 17 Turning to the merits, the plaintiffs argue that the circuit court erred in dismissing their amended complaint on grounds that the confidentiality provision violated public policy because the well-pleaded facts do not establish that the parties' agreement violated federal bank fraud laws. We disagree.

¶ 18 As a general rule, courts will not enforce private agreements that are contrary to public policy. *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 341 (1989). The public policy of the state of Illinois is found not only in the constitution, statutes, and long-standing case law (*Clark v. Children's Memorial Hospital*, 2011 IL 108656, ¶ 79) but can also be found in federal law (*Wheeler v. Caterpillar Tractor Co.*, 108 Ill. 2d 502, 506 (1985)). Because Illinois public policy favors the freedom to contract, we use our power to declare a contractual provision void on public policy grounds sparingly. *American Access Casualty Co. v. Reyes*, 2013 IL 115601, ¶ 9. "A contractual provision will not be invalidated on public policy grounds unless it is clearly contrary to what the constitution, the statutes, or the decisions of the courts have declared to be the public policy or unless it is manifestly injurious to the public welfare." *Id.* The question of whether a contract is contrary to public policy turns on the particular facts and circumstances of each case. *Id.*

¶ 19 The Illinois Supreme Court has noted that "[t]here is no public policy more basic, nothing more implicit in the concept of ordered liberty [citation], than the enforcement of a State's criminal code." *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 132 (1981). " 'Public policy favors the exposure of crime, and the cooperation of citizens possessing knowledge

- 5 -

thereof is essential to effective implementation of that policy.' " *Id.* (quoting *Joiner v. Benton Community Bank*, 82 Ill. 2d 40, 44 (1980)). As such, individuals "acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them by the fear of unfounded suits by those accused." (Internal quotation marks omitted.) *Id.* at 132-33; see also *Roberts v. United States*, 445 U.S. 552, 557 (1980) (noting that the "[c]oncealment of crime has been condemned throughout our history"). It is apparent that the concealment of crime and "agreements to conceal information relevant to the commission of crime have very little to recommend them from the standpoint of public policy." *Branzburg v. Hays*, 408 U.S. 665, 696 (1972).

¶ 20     Given the magnitude of the public policy interest here, it is not surprising that contracts barring the reporting of crimes are held to be unenforceable. In *Williamsen v. Jernberg*, 99 Ill. App. 2d 371, 372 (1968), for example, the defendant was accused by Williamsen of fraud, deceit, and larceny. The defendant agreed to make up the loss and sign a note in return for Williamsen's promise to drop criminal charges that were pending against the defendant's brother. This court held that the note given to one who knows of the commission of a crime for the purpose of compounding or concealing the crime or of preventing prosecution therefore is illegal and void. *Id.* at 375; see also *Griner v. Griner*, 34 Ill. App. 3d 792, 793 (1976). These cases indicate that, when two interests collide, Illinois has expressed a stronger interest in the punishment of wrongful behavior than in the strict enforcement of contracts.

¶ 21     Secondary authorities provide further support for the proposition that an agreement to conceal a crime contravenes public policy. See Restatement of Contracts § 548(1) (1932) ("A bargain in which either a promised performance or the consideration for a promise is concealing or compounding a crime or alleged crime is illegal."). This rule applies "whether the crime in question is a felony or a misdemeanor, and whether the accused is innocent or guilty of the crime." Restatement of Contracts § 548(1) cmt. a (1932).

¶ 22     In this case, the circuit court's determination that the confidentiality provision was unenforceable as contrary to public policy was based upon the federal bank fraud statute (18 U.S.C. § 1344 (2012)) and the fraud and false statements statute (18 U.S.C. § 1014 (2012)). Section 1344 provides:

> "Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; or
> >
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1344 (2012).

Section 1014 states, in pertinent part, as follows:

> "Whoever knowingly makes any false statement or report *** for the purpose of influencing in any way the action of the *** Small Business Administration *** upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, [or] loan *** shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1014 (2012).

¶ 23     These federal laws establish a clearly mandated public policy, one that is national in scope, and were enacted to protect the financial integrity of federally insured financial institutions and

assure a basis for federal prosecution of those who victimize these banks through fraudulent schemes. *United States v. Jacobs*, 117 F.3d 82, 93 (2d Cir. 1997). We also note that Illinois has indicated its own interest in preventing this precise injury by enacting section 17-10.6 of the Criminal Code of 2012 (720 ILCS 5/17-10.6 (West 2014)). Indeed, the language of section 17-10.6(c) is virtually identical to that of section 1344, insofar as section 17-10.6(c) criminalizes any "scheme or artifice *** to defraud a financial institution" by means of false pretenses, representations, or promises. 720 ILCS 5/17-10.6(c) (West 2014).

¶ 24　　In the instant case, taking the well-pleaded facts in the amended complaint as true, there is no question that the effect of the "Agreement," executed on September 19, 2012, worked a substantial economic injury to the IBC, SomerCor, and the SBA, and was in violation of state and federal law. Not only do the plaintiffs candidly admit in their amended complaint that Jagaria made several false statements on the loan applications to the IBC and SomerCor, but the exhibits attached to the amended complaint reveal that Singapori himself engaged in deceptive and fraudulent acts when he, at Novak's loan closing on October 10, 2012, signed a note, loan agreement, and borrower's certification purporting to be the "President" of Novak. By listing himself as a "50% [*sic*]" owner of Novak on the loan applications and then signing his name as the president of Novak and certifying that he accurately disclosed all material facts, Singapori intentionally misled the ICB, SomerCor, and the SBA. It was through this affirmative fraudulent act that Singapori concealed the fact that an ownership change in Novak occurred and that Jagaria had become the sole owner of the company. To hold the parties bound by their contractual obligation to maintain silence would in this case require this court to assist the plaintiffs in concealing their fraudulent misrepresentations to the IBC and SomerCor in violation of state and federal law.

¶ 25　　Moreover, although the plaintiffs devote their entire argument on this issue to the narrow question of whether the facts pled in the amended complaint conclusively establish that a federal crime occurred, we note that courts have held that a contract may violate public policy even where no crime occurred.[3] For example, the Tenth Circuit Court of Appeals held that "[a]n agreement, the object of which is the commission of a civil wrong against a third person, is *** illegal and void even though such wrong may not be an indictable offense or crime." *Lachman v. Sperry-Sun Well Surveying Co.*, 457 F.2d 850, 852-54 (10th Cir. 1972); see also Restatement (Second) of Contracts § 192, at 60 (1981) ("A promise to commit a tort or to induce the commission of a tort is unenforceable on grounds of public policy."); 6A Arthur Linton Corbin, Corbin on Contracts § 1455, at 525 (1962) ("A bargain is illegal if it is made for the purpose of defrauding one or more third persons, or if its terms are such that it will have such an effect."); 7 Richard A. Lord, Williston on Contracts § 16:14, at 480 (4th ed. 2010) ("[A] bargain which contemplates a wrong to a third person, or to undefined members of the public, whether trespass, breach of trust, or fraud, is illegal."). Likewise, "[a] bargain to refrain from disclosing to a third person, to whom a duty of disclosure exists, information of value or interest to him is illegal" and "a bargain necessarily involving a breach of a previous contract with another party or tending to induce such wrongful non-performance" is illegal. Lord, *supra*

---

[3] With only limited guidance from Illinois authorities, however, we turn to cases in other jurisdictions considering the enforceability of a contract, the object of which is the commission of a civil wrong against a third person.

§ 16:14; see also *Unami v. Roshan*, 659 S.E.2d 724, 725-27 (Ga. Ct. App. 2008), *S.R. & P. Import Co. v. American Union Bank*, 204 N.Y.S. 755 (Sup. Ct. 1924).

¶ 26     In *Shea v. Grafe*, 274 N.W.2d 670, 671-72 (Wis. 1979), the plaintiff purchased a motor home from the defendant for $19,000 with a $1000 down payment. To facilitate financing for the purchase, the parties' inflated the terms of the sales contract showing a purchase price of $21,000 with a down payment of $4500. Financing was approved by a bank and the plaintiff took possession of the motor home. Shortly thereafter, however, the plaintiff experienced problems with the motor home's water system, became "thoroughly disgusted with the motor home," and brought action against the defendants alleging violations under the Wisconsin Consumer Act. *Id.* at 672. In reversing the trial court's judgment in the plaintiff's favor, the Wisconsin Supreme Court held that the purchase contract was void as against public policy because it "involve[d] the defrauding or victimizing of third persons [(the bank)] as its ultimate result." (Internal quotation marks omitted.) *Id.* at 673. The court reasoned that:

> "Responsible financing is a vital part of a healthy economy and is essential to commerce. Lending institutions must be able to rely on the integrity of the representations of those who seek financing. Public policy, therefore, demands that courts decline to enforce a contract or grant relief based on a contract upon the application of either of the conspiring parties unless failure to enforce or grant the relief sought would create a greater injustice than that sought to be avoided by nonenforcement." *Id.*

Because the contract contained inflated selling price and down payment figures, which were designed to induce the lending institution to finance the transaction, the Wisconsin Supreme Court concluded that "the contract contemplated misleading the institution and therefore is tainted with illegality." *Id.* Since the contract was void as contrary to public policy, the court concluded it was "obliged to return the parties to the position in which [it] found them." *Id.* at 674.

¶ 27     Similarly, here, taking the well-pleaded facts in the plaintiffs' amended complaint as true, it is clear there is no question that the purpose of the confidentiality provision was to conceal the parties' prior and continuing misrepresentations to the banks and the SBA. Singapori and Jagaria had existing loans with the IBC and SomerCor that barred them from changing the ownership structure of Eshaan without prior written consent of SomerCor and the SBA. Singapori and Jagaria nevertheless entered into an "Agreement" changing their ownership interests in Eshaan without SomerCor's or the SBA's knowledge or written consent and admittedly sought to conceal their actions with the confidentiality provision. Indeed, the plaintiffs, in their amended complaint, candidly admit that the purpose of the confidentiality provision was to "protect against disclosure" and guard against the possibility that disclosure to the banks or the SBA would result in a default under the loan agreement and guarantee. Regardless of whether the parties' conduct constitutes a federal crime, the injury inflicted upon the third-party banks is the same. It is this injury that the law has an interest in correcting. We do not see any indication that the nature of the injury, whether criminal or tortious, is essential to the central issue of whether the confidentiality provision is contrary to the public policy of this State.

¶ 28     In sum, based upon our review of the amended complaint and the exhibits attached thereto, it clearly and conclusively appears that the "Agreement" and loan transaction were knowingly entered into by both Singapori and Jagaria for the purpose of defrauding the IBC, SomerCor,

and the SBA. Defrauding a financial institution is contrary to law and against public policy, and a ruling here in accordance with the argument advanced by the plaintiffs would serve to frustrate this policy. In addition, we will not enforce a contract that purports to bar a party—here, Jagaria—from reporting another party's alleged misconduct. We have no doubt that a confidentiality provision requiring Jagaria to conceal possible crimes or tortious conduct against a third party is contrary to public policy. We conclude, therefore, that the circuit court properly dismissed the plaintiffs' amended complaint where the confidentiality provision is contrary to public policy and void *ab initio*. See *Brelsford v. Stoll*, 304 Ill. App. 222, 229-30 (1940) (holding contract void *ab initio* where both parties entered into it for the purpose of conducting an illegal gambling enterprise).

¶ 29    Having found that the circuit court properly dismissed the plaintiffs' amended complaint, we need not address the parties' alternative arguments as to whether the liquidated damages clause is an unenforceable penalty.

¶ 30    We finally address the defendants' cross-appeal in which they assert that the circuit court erred in denying their petition for attorney fees. The defendants argue that, pursuant to section 15 of the "Agreement," the prevailing party in litigation is entitled to reasonable attorney fees and costs. We disagree.

¶ 31    "Generally, where the parties to a contract against public policy are *in pari delicto*, or equally at fault, a court will not aid either party but will leave both parties where it finds them." *O'Hara*, 127 Ill. 2d at 348. "This rule is designed not to help any party but rather to protect the public." *Id.* "It is believed that by refusing to enforce such contracts, courts will deter similar contracts in the future." *Id.*

¶ 32    In this case, Singapori and Jagaria were jointly engaged in an enterprise that was illegal and contrary to public policy. They stood on equal footing and are equally at fault for entering into the "Agreement." Accordingly, the parties are *in pari delicto*, and we will not aid either party but instead leave them where we found them. We conclude, therefore, that the trial court did not err in denying the defendants' petition, pursuant to section 15 of the "Agreement," for attorney fees and costs.

¶ 33    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County dismissing the plaintiffs' amended complaint with prejudice and denying the defendants' petition for attorney fees and costs.

¶ 34    Affirmed.