2024 IL App (1st) 230847-U

SIXTH DIVISION

December 31, 2024

No. 1-23-0847

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| AARON AND STACY MARX, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 19 L 2839 |
| | ) | |
| MICHAEL CHORVAT, JENNIFER KIRCHENS, HOME | ) | |
| ADVANTAGE INSPECTIONS, INC., and FERNANDO | ) | |
| LOPEZ, | ) | Honorable |
| | ) | Jerry A. Esrig, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Justice Hyman concurred in the judgment.
Justice Gamrath concurred in part and dissented in part.


**ORDER**

¶ 1    ***Held:***    Appellants homebuyers brought claims against the sellers for common-law fraud
and violations of the Residential Real Property Disclosure Act (765 ILCS 77/1 *et
seq.* (West 2016)), along with claims against their home inspection service and

inspector for Consumer Fraud, common-law fraud, negligence, and breach of contract. The circuit court granted summary judgment to all defendants. On appeal, we partially reverse summary judgment in favor of the sellers because there is a genuine issue of material fact regarding whether they had actual knowledge of a material defect that caused leaking in the basement, and affirm the grant of summary judgment with respect to the home inspection company and the inspector because the inspection contract contained an enforceable exculpatory clause, and there was no evidence of fraud.

¶ 2    This case arises from a home purchase by the plaintiffs-appellants Aaron and Stacy Marx (the Buyers) from defendants-appellees Michael Chorvat and Jennifer Kirchens (the Sellers). Before the closing, the Buyers hired defendant-appellee Home Advantage Inspections, Inc. (Home Advantage) to perform a home inspection, which defendant-appellee Fernando Lopez (collectively, "Inspection defendants") performed. Following the closing, the Buyers allegedly discovered numerous defects and brought claims against the Sellers and the Inspection defendants. The circuit court granted summary judgment to all defendants. For the reasons below, we reverse in part and affirm in part as to the Sellers, affirm as to the Inspection defendants, and reverse the attorney fees awarded to both.

¶ 3                                BACKGROUND

¶ 4    On February 28, 2018, the Buyers agreed to purchase a home ("the Property") located on the 4400 block of North Keystone Avenue in Chicago from the Sellers. The Sellers provided the Buyers with a Residential Real Property Disclosure Report ("disclosure form") pursuant to the Residential Real Property Disclosure Act (Disclosure Act) (see 765 ILCS 77/1 *et seq.* (West 2016)). Therein, the Sellers indicated they were not aware of any material defects in the Property.

¶ 5    Before the closing, the Buyers entered into a written agreement ("the Agreement") with Home Advantage to inspect the Property. The Agreement contained the following clause: "Home Advantage Inspections assumes no liability and shall not be liable for any mistakes, omissions, or errors in judgment of its employees, or subcontractors, beyond the cost of the inspection report,"

or $449. Lopez inspected the subject property on behalf of Home Advantage and prepared a report (2018 Inspection).[1] The closing occurred on April 16, 2018.

¶ 6    On March 15, 2019, the Buyers filed their initial complaint against the Sellers and Home Advantage. They later filed amended and second amended complaints, the latter of which the circuit court dismissed with prejudice in part and without prejudice in part. Those portions of the Buyers' claims dismissed with prejudice are not at issue in this appeal. On August 3, 2020, the Buyers filed their third amended complaint, the operative complaint here, in which they raised five claims (Counts I to V) under the Disclosure Act for failure to disclose material defects in five corresponding categories: (I) Flooding and Sewer, (II) Roof, (III) Windows and Walls, (IV) Electrical Issues, and (V) HVAC. Count I complained, in relevant part, that the Sellers "knew that the basement was subject to flooding and leakage and that the sewer was substantially impaired." The third amended complaint also alleged common-law fraud against the Sellers based on the representations made regarding the five categories of defects, along with an additional alleged misrepresentation that the Property was a "rehab."

¶ 7    The Buyers also raised four claims against the Inspection defendants: (1) negligence in the performance of the home inspection, (2) breach of contract, (3) common-law fraud for Lopez's failure to properly explain certain defects in the 2018 Inspection; and (4) a violation of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2016)).

¶ 8    On June 2, 2021, the circuit court referred the parties to arbitration, which resulted in a decision in favor of all defendants. The Buyers rejected the arbitration decision and continued the litigation pursuant to Cook County Circuit Court Rule 25.11(d) (Apr. 1, 2021).

---

[1] We note that Home Advantage did not acknowledge Lopez's employment or contractor status but stated in its answer that Lopez "was the Inspector for Home Advantage Inspections who conducted the inspection."

¶ 9    Following discovery, the Sellers moved for summary judgment. Regarding the Disclosure Act claims, the Sellers contended the Buyers had developed no evidence that the Sellers had actual knowledge of material defects they failed to disclose. Instead, the Sellers argued, the Buyers' evidence only consisted of photographs and videos taken after closing which did not allow for an inference of actual knowledge. The Sellers noted the 2018 Inspection only identified the potential for water intrusion issues to occur in the future, and further contended they completed the disclosure form consistent with the information they received from their initial inspection (2013 Inspection) and the 2018 Inspection.

¶ 10    The Sellers also claimed summary judgment was appropriate because the Buyers waived their Disclosure Act claims by virtue of a letter from the Buyers' attorney preceding closing. In the letter, the Buyers represented they would be "willing to forego any action on" issues listed in the 2018 Inspection, with the exception of HVAC and foundation issues. The letter expressed concern with "the foundation and its current condition" because "various areas show cracks, moisture intrusion, and efflorescence that is likely the result of years of moisture buildup." In reaction to the letter, the parties agreed to a $3000 cash payment from the Sellers to the Buyers to address the foundation, and the Sellers addressed the HVAC concerns before closing.

¶ 11    Regarding common-law fraud, the Sellers argued the Buyers could not show reasonable reliance because they conducted their own pre-sale inspection and post-sale repairs, and the Sellers did not misrepresent that the home was a rehab because "[w]hen [the] Sellers purchased the Property it was described as a 'recent rehab' in the MLS listing and [the] Sellers had no reason to believe it was not."

¶ 12    The 2013 Inspection, attached to the Sellers' motion, contained the following passages: "Downspouts discharge too close to building foundation at front. Water draining against

foundation can cause serious damage to structure and water leakage into the basement over time." It further noted that the "basement finished walls" had no moisture issues detected. The 2018 Inspection, also attached, contained the following entry, titled "Basement foundation": "Efflorescence, a white salty deposit, was noted on the surface of the concrete foundation. This may indicate moisture penetration into the walls with subsequent surface evaporation. This condition should be monitored and evaluated as needed by a qualified waterproofing contractor. No elevated levels of moisture were found."

¶ 13    Chorvat also attached his affidavit to the motion, in which he stated, in relevant part, that, "When we purchased the Property, the home had many new components, including but not limited to new siding, new windows, new appliances, new cabinets, new fixtures, new electrical, new flooring, and a new rear deck. The Property was exceptionally clean. I believed the Property was rehabbed in 2013 when we purchased the Property, and I believe that the Property was rehabbed *** to this day." He further stated, "In the five years that we lived at the Property, I never experienced any flooding or recurring leakage in the crawl space or the basement, and we never had the crawl space or basement evaluated by a professional for any problem related to flooding or recurring leakage." Moreover, "In the five years that we lived at the Property, I did not have any knowledge of any active leaking in the basement or crawl space and did not have any knowledge of water stains that could suggest a problem." Finally, "Shortly before we listed the Property for sale, I noticed efflorescence on the basement wall at some point in late 2017 or early 2018 but we did not have it evaluated by a professional and neither of us had any knowledge of what causes efflorescence. We did not conceal any efflorescence as evidenced by [the 2018 Inspection], which clearly identified the issue prior to the [Buyers'] purchase of the Property."

¶ 14    The Buyers filed a response in opposition to the Seller's motion for summary judgment, arguing the record contained sufficient evidence to create genuine issues of material fact as to whether the Sellers knowingly failed to disclose defects in the five claimed categories. In support, the Buyers pointed to four portions of the record:

1. The affidavit of their neighbor Timothy Davis, who stated that he observed water pooling on the Property's patio after rain, and birds nesting in the southwest gutters while the Sellers owned the home. Davis averred that he informed Chorvat of the nests, though Chorvat testified at his deposition that he recalled no such conversation.

2.  A statement from a contractor detailing work performed on the Property post-closing.

3.  The deposition of Carl Byrd, a deputy commissioner for the City of Chicago Department of Buildings, who testified that a post-closing inspection of the Property revealed code violations and work likely done by uncertified or unlicensed contractors.

4. The report from their retained expert Michael Panish, which included his opinion that the Sellers were likely "intimately aware" of on-going water leakage issues in the basement.

¶ 15    For their fraud claim, the Buyers contended that the Property did not meet the Midwest Real Estate Data (MRED) definition of a "rehab," which allegedly denoted "repair or replacement within the past year of at least 75 percent of fixtures and systems throughout the majority, if not all, [of] the residence." They further argued, "when it was advantageous not to claim the home as a rehab when seeking a tax reduction, [the Sellers] capitalized on the opportunity to compare the subject property to other homes that were land value only or needed to be fully gutted and rehabbed," referencing documents submitted by the Sellers to the Cook County Assessor's Office in an effort to reduce their property taxes.

¶ 16    The Buyers referenced exhibits in their response, but did not file the exhibits along with the response, and did not include Panish's deposition transcript amongst them.

¶ 17    The Inspection defendants also moved for summary judgment, arguing in relevant part that the Agreement's exculpatory clause was enforceable and limited their liability to the cost of the inspection. They further contended the Buyers could point to no evidence demonstrating Home Advantage or Lopez knowingly made any false representations or engaged in any deceitful conduct. Instead, they argued, the 2018 Inspection appropriately identified potential issues with the Property and recommended that the Buyers conduct further inspections, advice the Buyers ignored. The Buyers responded, arguing in relevant part that the Agreement's exculpatory clause should be deemed unenforceable, and the 2018 Inspection failed to provide "accurate" information. They also argued Lopez's conduct violated the Home Inspector License Act (see 225 ILCS 441/1-1 (West 2016)).

¶ 18    The exhibits attached to the Inspection defendants' motion included Panish's deposition and the exhibits thereto, including his report and CV. Panish's report was not in the form of an affidavit, and did not have attached to it the materials on which he based his opinions. During his deposition, when asked to explain his conclusion that the Sellers had actual knowledge of flooding and leaks in the basement, Panish responded, "I have seen evidence that they deny that they had any awareness of [flooding or leaking], but it's highly unlikely from efflorescence that I saw in that foundation and from the overall intrusions through the paint and the bubbling and all the cracking that was down there that they lived in that property for a period of time without knowing there was water actively leaking through the foundation." He also emphasized the "smell and the mildew and the mold odors that occur with leaking foundations." Panish further explained he believed the leaking issues had been present for years because of the "drainage, you can tell by the

7

condition of the grade next to the house, you can tell by the condition of the foundation, you can tell by all of the overall paint inside, the bubbles and peels and cracks that this has been an ongoing continual situation for a long period of time." He acknowledged he did not visit the Property between 2013 and 2018, and his site visit did not occur until October 17, 2021.

¶ 19    Regarding the other Disclosure Act claims, Panish testified that he believed the Sellers did not fill out the disclosure form accurately with respect to (1) the roof, walls, windows, doors, or floors because of the "immediate moisture and air infiltration" issues the Buyers allegedly experienced; (2) the electrical system because it was "non-code compliant"; and (3) the HVAC system because it "did not look like [it was] in good condition."

¶ 20    Before the circuit court ruled on the summary judgment motions, the Sellers moved to exclude Panish's testimony and strike his report. They argued in relevant part that Panish's report did not comply with Illinois Supreme Court Rule 191 (eff. Jan. 4, 2013), because it was not in the form of an affidavit and did not have attached the documents upon which Panish relied. The Sellers also moved to exclude all exhibits referenced in the Buyers' summary judgment response, arguing that the exhibits were unauthenticated and not properly filed. The record does not indicate that the Buyers responded to these motions, or that the circuit court resolved them. The record does show that on October 18, 2022, the Buyers' exhibits were filed into the record, though it is unclear how this was accomplished because no corresponding certificate of filing appears in the record.[2]

¶ 21    Before the summary judgment hearing, the Buyers filed a sur-reply to the Sellers' motion for summary judgment, arguing in relevant part that Panish's deposition testimony could be considered in opposition to summary judgment. The Buyers also contended Panish's report did

_____

[2] At oral argument, the Sellers' counsel contended that the Buyers eventually filed their exhibits but did so in an untimely fashion on October 18, 2022. The court also seemed to acknowledge this during the hearing.

not need to be in the form of an affidavit to be considered as proper evidence because he testified regarding his opinions at his deposition.

¶ 22   On November 4 and 9, 2022, the circuit court heard oral arguments on the summary judgment motions. During the November 4 argument, the court first considered the Sellers' motion to strike the Buyers' exhibits, and stated, "I will not consider any evidence submitted by any party that is not properly authenticated by an affidavit." The court did not specify which of the Buyers' exhibits this finding disqualified, but continued, "So if the [Buyers are] asking me to consider a photograph that is not supported by an affidavit or sworn testimony in a deposition, then I'm not going to consider it. If the [Buyers are] asking me to consider her expert's report, and *** there's no affidavit attesting to and authenticating expert's report, it is not going to be considered." The court further noted that the Buyers only referenced Panish's report, not his deposition testimony, in its initial summary judgment response. It explained, "it is not the job of the Court to search the record to determine whether or not the facts asserted without citation are supported somewhere in the record."

¶ 23   Turning to the substance of their motion, the Sellers' attorney emphasized their arguments on lack of actual knowledge, waiver, and lack of reasonable reliance for purposes of fraud. Counsel argued, "I think the circumstantial evidence still needs to at least create an inference that there could have been knowledge on behalf of my clients, and I don't believe that's the case." On the bird's nest issue, counsel argued Davis' affidavit did not show knowledge of a material defect, and the court responded that while there was a "dispute about whether [Chorvat and Davis] ever talked about birds," there was "no evidence the neighbor said anything about birds in the siding."

¶ 24    The hearing was continued until November 9. In the interim, on November 7, the Buyers filed affidavits from Stacy Marx and Panish purporting to authenticate exhibits. The Panish affidavit still did not attach the documents he considered for his report.

¶ 25    The hearing resumed on November 9. Counsel for the Sellers reiterated that Panish's report was not competent evidence because it was not in the form of an affidavit and did not include the proper attachments. On common-law fraud, counsel argued the Buyers "actually hired their own inspection company to investigate the foundation to see what needed to be done with respect to the moisture, efflorescence, and cracking in the foundation. So the [Buyers] did not rely on the [S]eller's representations whatsoever with respect to [that issue]."

¶ 26    In response, the Buyers' counsel emphasized the rehab issue, to which the circuit court replied, "The trouble of that argument is, No. 1 *** the [Sellers] were told it was a rehab when they bought the house. There is no evidence that they, in the interim, uncovered anything to suggest it wasn't a rehab." Counsel also argued there was evidence the Sellers "did know on some occasions that there was flooding, there was water." The court asked for a citation from the record, to which counsel responded she was "relying on the invoices and the photographs."

¶ 27    The circuit court granted the Sellers' motion for summary judgment on all counts, explaining, "There is no evidence in this case, let alone clear and convincing evidence, that the [S]ellers knew about the defects that are complained of here, at least any of the material defects." The court further found the Buyers "were put on notice of all of these issues by their own inspection report, and that there was a contractual waiver when they agreed" to the $3000 payment. Finally, the court also found no reasonable reliance because the 2018 Inspection suggested the Buyers should conduct "other inspections, which they decided not to do."

¶ 28    The matter moved to the Inspection defendants' motion for summary judgment. Before any substantive argument, the circuit court interjected, "[I]s there a question of fact with respect to the [$449]? Maybe. But if you're telling me that your clients are willing to agree to a judgment in the amount of [$449], I certainly find that the with-damage limitation in the contract is enforceable." The court concluded, "I think the safest thing to do is to enter judgment in favor of [the Buyers] for the $[449] *** [and] grant the motion for summary judgment based on the limitation." The Buyers' counsel objected, noting that fraud claims remained pending, and a grant of summary judgment could expose the Buyers to attorney fee petitions. The court maintained its ruling. The November 14, 2022, order entering the judgments, however, did not contain a provision awarding $449 to the Buyers, and simply stated, "For all the reasons stated on the record, the Defendants' Motions for Summary Judgment are granted."

¶ 29    Both sets of defendants moved for attorney fees against the Buyers pursuant to Cook County Circuit Court Rule 25.11 (Apr. 1, 2021). Following a hearing on April 14, 2023, the circuit court awarded attorney fees to counsel for the Inspection defendants in the amount of $8032.50, and to counsel for the Sellers in the amount of $11,200. This appeal followed.

¶ 30                                  JURISDICTION

¶ 31    The circuit court entered the final order on attorney fees on April 14, 2023, and the Buyers filed their notice of appeal on May 10, 2023, giving this court jurisdiction pursuant to Illinois Supreme Court Rule 303 (eff. July 1, 2017).

¶ 32                                  ANALYSIS

¶ 33    On appeal, the Buyers argue the circuit court erred in granting summary judgment to both sets of defendants on all counts, and also challenges the attorney fee awards. Summary judgment is appropriate where the "pleadings, depositions, and admissions on file, together with the

11

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). The purpose of summary judgment is not to try an issue of fact, but to determine if any genuine issue of material fact exists. *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 14. A triable issue exists where there is a dispute concerning material facts or where those facts are undisputed but reasonable persons might draw different inferences from those facts. *Id.* ¶ 15. Expert testimony, if sufficiently supported by the record, can create genuine issues of material fact. See *Gillespie v. Edmier*, 2020 IL 125262, ¶¶ 13-16; *Stone v. Clifford Chrysler-Plymouth, Inc.*, 333 Ill. App. 3d 363, 369 (2002). When a party submits affidavits in support of summary judgment, the factual statements contained therein will be deemed admitted if the opposing party does not rebut the affidavit. See *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 170-71 (2004). Rebuttal can be accomplished via counteraffidavit, (see *Id.*), or via deposition testimony (see *Sacramento Crushing Corp. v. Correct/All Sewer Inc.*, 318 Ill. App. 3d 571, 575 (2000)). Summary judgment is a "drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt." *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986). We review a grant of summary judgment *de novo*. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008).

¶ 34                                    **A. Claims Against the Sellers**

¶ 35                                    **I. Disclosure Act Claims**

¶ 36    We first consider the grant of summary judgment to the Sellers. The Buyers raised five claims under the Disclosure Act against the Sellers, corresponding to alleged misrepresentations regarding the existence of defects in five areas: (1) Flooding and Sewer, (2) Roof, (3) Windows and Walls, (4) Electrical Issues, and (5) HVAC. The Buyers also pursued a common-law fraud

claim against the Sellers for these alleged misrepresentations, along with a distinct theory of fraud for the Sellers' allegedly misrepresenting the Property as a "rehab."

¶ 37    The Disclosure Act requires sellers to "disclose material defects of which the seller has actual knowledge." 765 ILCS 77/25(b) (West 2016). A material defect is any "condition that would have a substantial adverse effect on the value of the residential real property or that would significantly impair the health or safety of future occupants of the residential real property." *Id.* § 35. A claimant under the Disclosure Act may recover for actual damages suffered and need not prove causation to establish the claim, as liability is "mandatory" for a seller who fails "to comply with a duty under the Act." *Messerly v. Boehmke*, 2014 IL App (4th) 130397, ¶ 56.

¶ 38    We must first determine what evidence is properly in the record on summary judgment, as the Sellers maintain the following objections on appeal: (1) the Buyers's exhibits in their response to the Sellers' motion were inadmissible, and (2) Panish's report was improper under Rule 191.

¶ 39    First, regarding the Buyers' exhibits, the record does not contain a clear indication that the Buyers properly filed them, though both parties appeared to acknowledge at the summary judgment hearing that the Buyers did so on October 18, 2022. Outside of the filing issue, the Sellers also challenge the exhibits on the basis of foundation and authenticity. The Buyers filed affidavits on November 7, 2022, in between the November 4 and November 9 hearing dates, in an attempt to cure these issues. While this record is indeed convoluted, and we agree with the Sellers that the November 7 affidavits are of dubious validity, we conclude that we need not substantively resolve any admissibility issues on the Buyers' exhibits. As we explain below, even if the exhibits were all properly filed, authenticated, and admissible, none of them provide substantive support for the Buyers' claims.

¶ 40     Second, on Panish's report, we find it did not follow the strictures of Rule 191, and thus is not part of the record on summary judgment. Rule 191 requires that an expert affidavit filed in support of, or opposition to, summary judgment must attach the documents upon which the expert relied. Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013). This a strict requirement. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335-38 (2002). At no point did the Buyers comply with this requirement, even in the November 7 filing. Accordingly, Panish's report is not properly part of the record on summary judgment and will not be considered substantively by this court.

¶ 41     We now turn to the substance of the Buyers' claims, beginning with Counts I to V under the Disclosure Act. First, we find the circuit court properly granted summary judgment on Counts II through V--each claim besides Count I for Flooding and Sewer. The Buyers do not identify any grounds in the record (even allowing that their exhibits are part of it) for this court to conclude that a genuine issue of material fact existed of whether the Sellers had actual knowledge of material defects in these systems. The Buyers' arguments on these counts, both in its briefing before this court and below at summary judgment, were so vague as to border on facially dismissible, and certainly do not suffice to identify specific genuine issues of material fact. In so finding, we note specifically that the Davis affidavit was insufficient to create a genuine issue of fact of whether the Sellers had actual knowledge of a material defect in the siding. The presence of birds in a gutter does not equate to birds in the siding, meaning even construing this evidence in the light most favorable to the Buyers, the Davis affidavit cannot support the necessary inference.

¶ 42     Regarding Count I, however, we find that a genuine issue of material fact exists as to whether the Sellers had actual knowledge of material defects which caused flooding in the basement, which they did not disclose to the Buyers on the disclosure form. We reach this finding based on Panish's testimony at his deposition (which was filed by the Inspection defendants as an

14

exhibit to their summary judgment motion, then referenced by the Buyers in their sur-reply) and the 2018 Inspection, neither of which the Sellers challenge as not properly part of the record.[3] The 2018 Inspection noted the presence of efflorescence in the basement, knowledge of which Chorvat admitted in his affidavit, though he denied that he ever experienced actual leaking or flooding. Panish contradicted this representation at his deposition, testifying that the extent of the efflorescence and staining issues led him to conclude that the Sellers likely had actual knowledge of leaking issues in the basement that pre-dated the completion of the disclosure form and was not disclosed. Interpreted in the light most favorable to the Buyers, the record reflects a dispute of material fact over whether flooding or leaking of which the Sellers were aware occurred in the basement before they completed the disclosure form, which is sufficient to create a genuine issue of material fact such that Count I survives summary judgment. See *Johnson v. Armstrong*, 2022 IL 127942, ¶ 31; see also *In re County Treasurer*, 302 Ill. App. 3d 639, 647 (1998) (generally, circumstantial evidence may suffice to establish actual knowledge). We note that on remand, the Buyers are limited to the aspect of Count I related to flooding and leaking only and may not pursue a claim based on a "sewer" defect.

¶ 43    In so finding, we acknowledge the issue, raised by the circuit court during the hearing and by the Sellers in their briefing, that the Buyers repeatedly failed to cite to the record with sufficient specificity. Most pertinent here, the court noted during the oral argument that the Buyers failed to cite specific pages and line numbers of Panish's deposition testimony on the water intrusion issue. But while the Buyers' citations left much to be desired, we find this shortcoming is not fatal. It is a court's task when considering a summary judgment motion to determine whether the entire

---

[3] We note that while Panish's deposition is unsigned, it is still validly part of the record on summary judgment because the Sellers made no motion to strike it below, as required by Illinois Supreme Court Rule 211(d) (eff. Oct. 1, 2024).

record before it is free of doubt as to the existence of a genuine factual dispute, as summary judgment is a "drastic" resolution only appropriate when the result is "clear." *Purtill*, 111 Ill. 2d at 240. The Buyers at least alerted the circuit court that their flooding and leaking defect claim was supported by Panish's opinions, which he offered at his deposition (which the Buyers referenced generally in their sur-reply, if not during the oral argument). Given this record, we find the Buyers did just enough to identify the inference of actual knowledge possible from the admitted presence of efflorescence and other staining in the basement, and Panish's opinions based thereon.

¶ 44    The Sellers argue that by virtue of the $3000 payment, the Buyers waived this claim. We disagree because the letter reflected the Buyers' willingness to waive claims based on the defects identified in the 2018 Inspection, which did *not* include the existence of a material defect that had previously caused flooding or leaking in the basement. The 2018 Inspection revealed both foundation issues and efflorescence, but only noted that these conditions *could* indicate moisture penetration issues. Allowing for the inference discussed above, the 2018 Inspection's uncertain language, combined with the Sellers' misrepresentation that no material flooding or leaking defect currently existed, is evidence that the Buyers did not know the actual extent of the condition at issue when it agreed to the $3000 payment, and thus never agreed to waive any claims based on that condition. See *Bauer v. Giannis*, 359 Ill. App. 3d 897, 906 (2005) ("Allowing a seller to ignore his or her obligation under the Act, avoid reporting a material defect, and thereby defeat a buyer's subsequent claim would only encourage the evils the legislature sought to remedy.").

¶ 45    The Sellers also argue that the affidavits they submitted in support of summary judgment, specifically Chorvat's, denied that any flood or leaks had occurred, and were not specifically rebutted by counteraffidavits from the Buyers. This argument fails because sufficient evidence to

rebut the affidavits, in the form of Panish's deposition, is properly included in the record on summary judgment. See *Sacramento*, 318 Ill. App. 3d at 575.

¶ 46                                    **II. Fraud**

¶ 47    Having resolved the Disclosure Act claims, we move to the Buyers' theories for common-law fraud against the Sellers. In order to recover for fraud, a plaintiff is required to prove that (1) the defendant made a false statement of material fact, (2) the defendant knew that the statement was false, (3) the defendant intended to induce the plaintiff to act in reliance upon the statement, (4) the plaintiff reasonably relied upon the truth of the statement, and (5) the plaintiff suffered damage as a result. *Lewis*, 2020 IL 124107, ¶ 30. In evaluating fraud claims, the law presumes that transactions are honest, and thus fraud must be proven by clear and convincing evidence. *Avery v. State Farm Mutual Auto Insurance Co.*, 216 Ill. 2d 100, 191 (2005).

¶ 48    Consistent with the above, we find that because there was no showing of actual knowledge ffor Counts II through V, those theories of fraud also fail. On Count I for leaking or flooding defects, however, we find there is a genuine issue of material fact of whether the statement in the disclosure form constituted fraud. If we accept that a genuine issue of material fact exists as to whether the Sellers actually knew of leaking or flooding in the basement, but chose to misrepresent this on the disclosure form, the record evidence can satisfy each element of fraud—the Sellers made a false statement, knew it was false at the time, and did so to induce the Buyers to continue with their purchase of the Property, which the Buyers did to their detriment. *Lewis*, 2020 IL 124107, ¶ 30; *Bauer*, 359 Ill. App. 3d at 906 ("A fraudulent misrepresentation claim may be based solely on a disclosure made pursuant to the Act.").

¶ 49    In so finding, we necessarily reverse the circuit court's finding on reliance specific to Count I only. That finding was predicated on the idea that the 2018 Inspection placed the Buyers on notice

17

of the full scope of defects in the basement, which ignores the issue that the 2018 Inspection only alerted the Buyers to potential for water penetration issues. Given the evidence in the record that at least permits the reasonable inference that leaks had in fact occurred in the past, which the Sellers knowingly misrepresented by denying the existence of a material defect on the disclosure form, the Buyers can establish reasonable reliance by showing they followed through with the purchase relying on the misrepresentation that *material* flooding or leaking defects did not yet exist. *Id.*; see also *Pack v. Maslikiewicz*, 2019 IL App 1st 182447, ¶¶ 105-08 (rejecting the argument that the plaintiff could not show reasonable reliance for a fraud claim because their own inspection of a home revealed potential issues, reasoning, "even if plaintiffs should have investigated further as to the permits, a defendant's liability for an intentional tort such as fraud generally cannot be defeated by an assertion of plaintiffs' negligence once plaintiffs show they had a right to rely on the misrepresentations"). Whether the Buyers' reliance was actually reasonable in light of the indications that a material defect existed regardless of the Sellers' representation (such as the issues listed in the 2018 Inspection and the Buyers' letter acknowledging the same) is a factual issue that may ultimately be resolved against them, but such resolution is inappropriate at the summary judgment stage. See *Lewis*, 2020 IL 124107, ¶ 14; *Centro Medico Panamericano, Ltd. v. Benefits Management Group, Inc.*, 2016 IL App (1st) 151081, ¶ 34 (reasonable reliance is typically a factual issue).

¶ 50    The theory of common-law fraud as to Count I, survives summary judgment, and its dismissal is reversed. While the theories for fraud on Counts II through V all fail, and their dismissal is affirmed.

¶ 51    Finally, we find the common-law fraud theory based on the Sellers' alleged misrepresentation that the Property was a rehab fails and affirm the circuit court's dismissal

thereof. The Buyers have cited no evidence that the Sellers knew the property was not a rehab. Instead, they rely on the alleged inconsistencies between the Property's condition at the time of purchase and the MRED definition of "rehab," but this evidence does nothing to establish the Sellers understood the property was not a rehab, then affirmatively misstated that to the Buyers, as would be required to establish the first two elements of fraud. *Lewis*, 2020 IL 124107, ¶ 30. Additionally, the Buyers' argument that the Sellers or their real estate agent *should* have known about the MRED definition is irrelevant because the Buyers did not raise a negligence claim, and the real estate agent is not a defendant. The claim also fails because the Buyers offered no evidence or argument establishing that the MRED definition of "rehab" has any legal significance such that describing a property in contravention of the definition could constitute fraudulent conduct, and it is not the role of this court to research this issue independently. See *Toushin v. Ruggiero*, 2021 IL App (1st) 192171, ¶ 73 (the appellate court "is not a depository in which a party may dump the burden of argument and research").

¶ 52    The Buyers argue that the Sellers' pursuit of a property tax reappraisal demonstrates actual knowledge that the Property was not a rehab, but the record does not support this claim. Instead, the relevant documents relating to the tax assessment only demonstrate that the Sellers requested a reduction of the Property's assessment and cited comparable properties in the same neighborhood with similar construction dates in support. The Buyers provide no explanation or testimony which could permit this court to conclude these documents allow an inference the Sellers knew the Property was not a rehab. *Id.*

¶ 53                    **B. Claims Against the Inspection Defendants**

¶ 54                    **1. Breach of Contract and Negligence**

¶ 55    We turn to the Buyers' claims against the Inspection defendants. Before substantively addressing these claims, we must address the issue that the circuit court's November 14, 2022, order does not reflect its intent as expressed in the November 9, 2022, hearing transcript. The order simply grants the Inspection defendants summary judgment, but the transcript is clear that the court intended to (1) enter judgment for the Buyers in the amount of $449 (the cost of the inspection and the agreed amount of damages per the Agreement's exculpatory clause); and to then (2) grant summary judgment to the Inspection defendants to the extent the Buyers sought recovery beyond that amount. Using our authority under Illinois Supreme Court Rule 366(a) (eff. Feb. 1, 1994), and finding that the report of proceedings illuminates the lower court's intent (see *P & A Floor Co., Inc. v. Burch*, 289 Ill. App. 3d 81, 88-89 (1997)), we correct the November 14, 2022 order to reflect a finding in favor of the Buyers for the amount of $449, with a grant of summary judgment to the Inspection defendants for any further claims, and will review the Buyers' claims on appeal accordingly. In so ordering, we are guided by the resolution in *Zerjal v. Daech & Bauer Construction, Inc.*, 405 Ill. App. 3d 907, 911-16 (2010) (affirming the grant of the defendant's motion to dismiss for any claims exceeding the amount stated in an enforceable exculpatory clause).

¶ 56    With the circuit court's order corrected, the issue on appeal now becomes whether the court appropriately granted summary judgment for the Inspection defendants on the Buyers' claims to the extent they exceed $449.

¶ 57    First, we consider the breach of contract and negligence claims, which, if the exculpatory clause is enforceable, would be precluded in full. *Id.* at 911 (citing *Harris v. Walker*, 119 Ill. 2d 542, 548 (1988)). The Agreement reads, in relevant part, "Home Advantage Inspections assumes no liability and shall not be liable for any mistakes, omissions, or errors in judgment of its

employees, or subcontractors, beyond the cost of the inspection report." In *Zerjal*, this court upheld a clause functionally indistinguishable from the one here, explaining that such clauses, whether described as exculpatory clauses or liquidated damages clauses, "are enforceable unless (1) enforcement would be against a settled public policy of the state" or "(2) something in the social relationship of the parties militates against enforcement." *Id.* The *Zerjal* court ruled that neither condition applied to the relationship between a potential homebuyer and an inspection service they hire to perform a preliminary home inspection, reasoning that (1) such clauses were not against public policy as violative of the Home Inspector License Act (225 ILCS 441/1-1 *et seq.* (West 2016)) because that statute "addresses the licensing and regulation of home inspectors but does not address inspectors' liability," and (2) the relationship between a home inspector defendant and homebuyer plaintiff was not "special" because the "homeowners are not in a position similar to the position of patrons of common carriers or employees [because] the homeowners were in control of their own fate and could have gotten a second inspection or bargained for different terms." *Id.* at 912.

¶ 58    Based on *Zerjal's* guidance, we find the Agreement's exculpatory clause was enforceable and affirm the circuit court's grant of summary judgment on the Buyers' negligence and breach of contract claims in excess of $449. The Buyers argue that both exceptions apply to invalidate the clause but fail to offer support for either theory. First, they contend the clause was against public policy. "A contractual provision will not be invalidated on public policy grounds unless it is clearly contrary to what the constitution, the statutes, or the decisions of the court have declared to be in the public policy or unless it is manifestly injurious to the public welfare." *American Access Casualty Co. v. Reyes*, 2013 IL 115601, ¶ 9. The Buyers' arguments do not implicate any of these scenarios, as they simply cite to the Home Inspector Act as evidence of a public policy violation,

21

a theory this court already considered and rejected. See *Zerjal*, 405 Ill. App. 3d at 912. The Buyers have not presented a substantive ground for this court to depart from this established area of law, and thus their public policy argument fails.

¶ 59    Second, regarding "special" social relationships, the Buyers again fail to explain why this situation is distinct from *Zerjal*; they provide no argument as to why they could not have bargained for better terms, including removal of the exculpatory clause, or retained a different home inspection company if they believed the offered terms were unfair. *Id.*; see also *Hussein v. L.A. Fitness International, L.L.C.*, 2013 IL App (1st) 121426, ¶ 19. It follows that, as in *Zerjal*, the Buyers have not established that its relationship with the Inspection defendants constituted a "special" social relationship such that the exculpatory clause could be invalidated based thereon.

¶ 60                              **2. Fraud and Consumer Fraud**

¶ 61    The enforceability of the exculpatory clause does not resolve all of the Buyers' claims against the Inspection defendants, though, because the clause does not shield the Inspection defendants from liability for intentional acts—which would include the claims for common-law fraud and Consumer Fraud. See *JPMorgan Chase Bank, N.A. v. East-West Logistics, L.L.C.*, 2014 IL App (1st) 121111, ¶ 65. The elements of fraud are listed above, while the elements of a Consumer Fraud claim are (1) the defendant engaged in a deceptive act or practice, (2) the defendant intended plaintiff to rely on the deception, (3) the deception occurred in the course of the defendant's business, (4) the plaintiff suffered actual damages, and (5) causation. *Tri-Plex Technical Services, Ltd. v. Jon-Don LLC*, 2024 IL 129183, ¶ 26. Both common-law fraud and Consumer Fraud claims require a showing that the defendant knowingly engaged in the alleged conduct. *Addison v. Distinctive Homes, Ltd.*, 359 Ill. App. 3d 997, 1000-01 (2005).

¶ 62    We find the Buyers' claims for both common-law fraud and Consumer Fraud against the Inspection defendants fail because the Buyers do not identify any specific acts or statements as fraudulent or deceptive. Moreover, the record rebuts any such claims, as the 2018 Inspection is thorough and neutral, and nothing therein could be construed as facially fraudulent or deceptive. The Buyers contend remand is appropriate because the circuit court did not substantively consider the Consumer Fraud claim during the summary judgment oral argument before making its ruling, but this argument fails because this court may affirm the lower court on any basis contained in the record, and the record is clear that the Buyers never identified any specific fraudulent or deceptive acts or statements by the Inspection defendants. See *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 34.

¶ 63                                      **C. The Dissent**

¶ 64    While the dissent says the Buyers' evidence is weak on "critical facts" and based on speculation, the dissent also says Buyers were aware of the defects like the cracks in the foundation, efflorescence, and moisture intrusion that was the result of years of moisture buildup. If these defects were evident to the Buyers, they would be evident to the Sellers and should have been disclosed on the Disclosure form. In his affidavit, Chorvat admitted to the presence of efflorescence in the basement, and he denied that he ever experienced actual leaking or flooding. We again note that the expert, Panish, contradicted this representation at his deposition by testifying that based on the extent of the efflorescence and staining issues, the Sellers likely had actual knowledge of leaking issues in the basement that pre-dated the completion of the disclosure form and were not disclosed. This presents a question fact for a jury.

¶ 65    The dissent's analysis ignores that actual knowledge can be demonstrated through circumstantial evidence. See *In re County Treasurer*, 302 Ill. App. 3d at 647. Given the Sellers

awareness and the lack of disclosure, whether the pre-disclosure flooding or leaking occurred is a fact under dispute, and there is no question the resolution of this dispute is material, meaning Count I (as limited to flooding or leaking defects) survives summary judgment. See *Lewis*, 2020 IL 124107, ¶¶ 14-15.

¶ 66    The dissent's analysis also fails to acknowledge the central inference for which Panish's testimony allows and characterizes the Buyers as acting with "willful ignorance." Again, if the Sellers experienced active flooding and leaking, but chose not to disclose it, the Buyers did not act with "willful ignorance;" instead, they simply relied on the Seller's Disclosure. A jury should decide whether Buyers should have known that Sellers misrepresented the condition of the home.

¶ 67    The dissent would have this court weigh Panish's testimony against the record evidence supporting the Sellers' position, decide we favor the Sellers' side, and grant summary judgment accordingly. Such a resolution is improper, regardless of whether we agree with the dissent's conclusions on the comparative strength of the evidence. The dissent does not dispute that the Buyers submitted *some* evidence to support their claim that the Sellers had actual knowledge of previous leaking and flooding, which they then failed to disclose. This created a genuine dispute of material fact for the factfinder to resolve at trial, the identification of which ends our role on review, and requires remand.

¶ 68                                  **D. Attorney Fees**

¶ 69    Finally, the Buyers challenge the award of attorney fees to both sets of defendants per Cook County Circuit Court Rule 25.11(d) (Apr. 1, 2021), which permits recovery of reasonable attorney fees when the party rejecting an arbitration award fails to procure a better result. We review an award of attorney fees for abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 13. Based on the above, neither attorney fee award may stand. First, the Sellers' counsel's attorney fee

award must be vacated because we reverse the grant of summary judgment on the limited bases described above. Second, the attorney fee award to the Inspection defendants' counsel must be reversed because the Buyers achieved a better result than the initial arbitration award of $0 when the circuit court entered judgment in its favor for $449, per the Agreement's exculpatory clause.

¶ 70                                    CONCLUSION

¶ 71    For the reasons stated above, we (1) reverse the grant of summary judgment against the Sellers respecting Count I and the corresponding theory for fraud; (2) affirm the grant of summary judgment on Counts II through V against the Sellers, the theories for fraud corresponding to those counts, and the "rehab" theory of fraud; (3) affirm the grant of summary judgment against the Inspection defendants in full; (4) vacate the attorney fee award to the Seller's counsel; (5) reverse the attorney fee award to the Inspection defendants' counsel; and (6) remand for further proceedings consistent with this order against the Sellers only.

¶ 72    Affirmed in part; reversed in part; vacated in part; remanded with instructions.

¶ 73    JUSTICE GAMRATH, concurring in part and dissenting in part:

¶ 74    I concur in the majority's decision to affirm summary judgment in favor of the Inspection defendants in full and in favor of the Sellers on Counts II through V and the corresponding fraud theories. However, it is my belief we should affirm summary judgment on Count I and related fraud theory against the Sellers. Therefore, I dissent.

¶ 75    Summary judgment is a drastic remedy, but it is also a suitable mechanism to avoid needless trials where, as here, the Buyers' evidence is so weak on critical facts that no judgment in their favor could stand. After four years of litigation, the only evidence the Buyers proffered to defeat summary judgment is the opinion of their expert Panish, who testified "it's highly unlikely from efflorescence that I saw in that foundation and from the overall intrusions through the paint

and bubbling and all the cracking that was down there that [the Sellers] lived in that property for a period of time without knowing there was water actively leaking through the foundation."

¶ 76    "Highly unlikely" suggests a low probability that the Sellers did not know of flooding or recurring leakage problems in the basement. However, this is different from "actual knowledge," which is the standard to prove fraud and liability under the Property Disclosure Act, and it is nowhere near the clear and convincing evidence the Buyers need to prove their case.

¶ 77    Had Panish left no doubt about the Sellers' knowledge, I would agree his opinion is sufficient to reverse summary judgment. But Panish merely speculates there is a likelihood based on photos, observations, and the scent of mildew and mold he smelled when he walked through the property on October 17, 2021, three-and-a-half years after the Sellers moved out and the Buyers moved in. Yet, the Buyers admitted there was no smell of mold or mildew when they purchased the property. Nor did their inspector or Permanent Seal detect one. Panish's opinion also presupposes there was active leaking into the basement despite no evidence whatsoever that the moisture penetrated through the walls and flooded the basement while the Sellers lived there. While an expert opinion is usually sufficient to raise a genuine issue of material fact, Panish's opinion must be based on fact. It cannot be a conclusion or based on an assumption or speculation to defeat summary judgment.

¶ 78    This is not a typical battle-of-the-expert case where reasonable minds could differ to preclude summary judgment. The Sellers unequivocally denied actual knowledge of flooding or recurring leakage in the basement. The Buyers have no evidence otherwise. Prior to the sale, the Sellers saw the same efflorescence that the Buyers' inspector saw on the walls. The Sellers said they did not know this was a sign of a recurring or active leak and denied any flooding in the basement. The Property Disclosure Act did not impose a duty on the Sellers to make any specific

investigation or inquiry about the efflorescence, so they did not. The Buyers, however, did investigate and admittedly knew before closing because of the inspection about cracks in the foundation, bubbling paint, moisture intrusion, and efflorescence that was "likely the result of years of moisture buildup." The majority says: "If these defects were evident to the Buyers, they would be evident to the Sellers and should have been disclosed on the Disclosure form." However, the defects became evident only after a professional inspector conducted a thorough and detailed inspection prior to closing, after the Sellers signed the Property Disclosure form.

¶ 79    On March 7, 2018, prior to closing, the Buyers hired a home inspector to inspect the property. The 64-page inspection report flags several areas of moisture intrusion and notes cracks in the foundation three separate times. The report mentions moisture 27 times and informs the Buyers that there is efflorescence on the foundation walls. The report shows pictures of efflorescence and bubbling paint along the basement wall. The report says this may indicate moisture penetration into the walls and recommends the Buyers have a qualified waterproofing contractor evaluate the condition. The report also highlights deficiencies in the drainage system and says that the routing of the downspouts can result in excessively high moisture levels at the foundation. The report recommends adding extensions to the drainage system to protect the home structure. It even includes a diagram for clarity. The report also notifies the Buyers of small openings in the vinyl siding and says they should be sealed to prevent moisture intrusion. The report describes the gutters and downspouts as "serviceable," but notes drainage blockage. It also alerts the Buyers to a grading and runoff deficiency and recommends regrading to prevent moisture intrusion.

¶ 80    The inspection report put the Buyers on notice of all sorts of moisture issues, including pooling of water at the base of the home and cracks in the foundation that "may allow water into

the structure." The report specifically and repeatedly recommends that the Buyers contact professional contractors to evaluate the several areas at risk of water. The Buyers chose not to until after they closed and agreed to forgo any action on issues contained in the inspection report, including routing of the downspouts, the grading and runoff deficiency, small openings in the siding, and all other conditions noted in the report. The only relevant issue the Buyers raised was over the "foundation and it's current condition," which their lawyer described in Exhibit A as "a major concern for [the Buyers]."

¶ 81 In Exhibit A, the Buyers admit: "Various areas show cracks, moisture intrusion, and efflorescence that is likely the result of years of moisture buildup." The Buyers asked for more time to "evaluate the cost/remedy of addressing this condition" and had Perma-Seal Basement Systems visit the property prior to closing and provide a bid. Perma-Seal identified three cracks in the foundation. It gave the Buyers a bid of $2,673 to repair the cracks and apply vapor barrier sheeting designed to protect the foundation from moisture damage. The Buyers negotiated a $3,000 credit from the Sellers for these issues, but did not do any of the work Perma-Seal recommended. They cannot accept payment, shut their eyes to the moisture problems, ignore the cracked and deteriorating foundation, moisture intrusion, efflorescence, and years of moisture buildup, and turnaround and recover for defects they had notice of prior to closing even if they were unaware of the extent of the damage.

¶ 82 In fact, the record shows no one was aware of the extent of the damage until after a major rain when the Buyers began noticing water-related problems and had contractors investigate. After a deep dive and scoping of lines, they discovered a collapsed drainage pipe buried underground and a downspout that burst at the seams causing water to leak from the rooftop, down the sides of the house, into the walls and windows, and pool at the foundation. The Buyers blame the Sellers

for this, alleging that their failure to maintain and clean out the gutters resulted in the downspouts splitting at the seams. This, coupled with the incorrect routing of the water and collapsed drainpipe below ground, caused a calamity of flooding problems that went undetected until the Buyers probed into it. But the Property Disclosure Act does not require a seller to inquire or investigate potential material defects prior to signing the Property Disclosure form. It does not require a seller to install or upgrade a drainage system to prevent future leaks. And it does not impose liability for mere neglect or ignorance where there is no actual knowledge of a recurring problem.

¶ 83    It is time to end this litigation where the facts clearly show the Buyers were aware of moisture problems and could have discovered the extent of the damage through a more diligent inspection, as their inspector recommended. The Buyers' willful ignorance of red flags and unreasonable reliance on the Property Disclosure form should not be rewarded absent specific facts of fraud or concealment, of which there is none. The Buyers bought the property and even negotiated a $3,000 credit based on cracks in the foundation, moisture intrusion, efflorescence, bubbling paint, and years of moisture buildup – all which Panish relied on to say the Sellers committed fraud. Under these circumstances, I agree with the trial court that the Buyers did not meet their burden of coming forth with sufficient facts to defeat summary judgment on Count I. Accordingly, I dissent.